Tatel, Circuit Judge:
When Joseph Shaber passed away, he left over $ 235,000 to the Libertarian National Committee (LNC). This case is about when and how the LNC can spend that money. The LNC argues that the Federal Election Campaign Act (FECA), which imposes limits on both donors and recipients of political contributions, violates its First Amendment rights in two ways: first, by imposing any limits on the LNC's ability to accept Shaber's contribution, given that he is dead; and second, by permitting donors to triple the size of their contributions, but only if the recipient party spends the money on specified categories of expenses. Scrutinizing each provision in turn, we find no constitutional defects and reject the LNC's challenges.
*536 I.
Over half a million voters have registered as Libertarians. See Findings of Fact ("CF") ¶ 3, Libertarian National Committee, Inc. v. Federal Election Commission , 317 F. Supp. 3d 202 (D.D.C. 2018). The LNC, the national committee of the Libertarian Party, has over 130,000 members and about 15,000 active donors. See CF ¶¶ 1, 3.
During his lifetime, Joseph Shaber was one of those donors, contributing a total of $ 3,315 in a series of relatively small donations over some twenty-five years. See CF ¶¶ 109-10. Unbeknownst to the LNC, Shaber intended to be a donor in death as well. See CF ¶ 115. In 2015, shortly after Shaber had passed away, the LNC learned that Shaber left it the generous sum of $ 235,575.20. See CF ¶¶ 117, 121.
But the LNC had a problem. Under FECA, "no person," 52 U.S.C. § 30116(a)(1), may make a contribution to a national political party committee above an inflation-adjusted annual limit, see id. § 30116(c) -which, in 2015, capped contributions at $ 33,400, see CF ¶ 119-and national party committees, in turn, "may not solicit, receive, ... or spend any funds" donated in excess of that limit, 52 U.S.C. § 30125(a). Furthermore, the Federal Election Commission (the "Commission"), the agency charged with enforcing FECA, interprets "person" to include the dead and their estates. See FEC Advisory Opinion 1999-14 (Council for a Livable World), 1999 WL 521238, at *1 (July 16, 1999) ("[A] testamentary estate is the successor legal entity to the testator and qualifies as a person under the Act ...."). Taken together, these restrictions prohibited the LNC from accepting more than $ 33,400 of Shaber's donation into the LNC's general fund in 2015.
But there was another way. Just the previous year, in 2014, Congress had amended FECA to permit donors to contribute, over and above their general-purpose contributions, amounts up to three times the base limit into each of three new kinds of "separate, segregated" party-committee accounts. Consolidated and Further Continuing Appropriations Act, 2015, Pub. L. No. 113-235, div. N, § 101, 128 Stat. 2130, 2772-73 (2014) (codified at 52 U.S.C. § 30116(a)(1)(B), (a)(9) ). Recipient parties may use these accounts to pay for "presidential nominating convention[s]," party "headquarters buildings," and "election recounts ... and other legal proceedings." 52 U.S.C. § 30116(a)(9). In 2015, then, the LNC could have accepted up to $ 334,000 from Shaber's bequest, taking $ 33,400 into its general fund and $ 100,200 into each of three segregated funds.
The LNC, however, preferred not to tie up the majority of Shaber's gift in segregated accounts, and the trustee in charge of distributing Shaber's gift concluded that she had no authority to require the LNC to accept the full bequest into a combination of general- and dedicated-purpose accounts because she "could not impose restrictions on Mr. Shaber's bequest that Mr. Shaber did not himself place." CF ¶¶ 126-27. Accordingly, the LNC accepted only $ 33,400 of Shaber's donation, see CF ¶ 119, and the trustee asked the Commission for an advisory opinion on what to do with the rest, see 52 U.S.C. § 30108(a) (requiring the Commission to issue written advisory opinions upon request). In that request, the trustee proposed to put the balance of Shaber's bequest into an escrow account that would disburse the maximum base-limit contribution into the LNC's general fund each year until the entire gift had been depleted (about seven years in total). See FEC Advisory Opinion 2015-05 (Shaber), 2015 WL 4978865, at *1 (Aug. 11, 2015). The Commission approved this plan, with the caveat that the escrow agreement *537 must prevent the LNC from "exercis[ing] control over the undisbursed funds." Id. at *3 n.4.
In September 2015, the trustee and the LNC signed an agreement under which the remaining $ 202,175.20 of Shaber's bequest would be deposited into an escrow account. See CF ¶ 128. Pursuant to the escrow agreement, in January of every year the LNC receives a payment equal to the inflation-adjusted contribution limit. See CF ¶ 128; see also Defendant Federal Election Commission's Memorandum in Support of its Motion to Dismiss and in Opposition to Plaintiff's Motion to Certify Facts and Questions, Ex. 27 ("Escrow Agreement") ¶ 3, Libertarian National Committee , 317 F. Supp. 3d 202 (No. 16-cv-00121), ECF No. 26-31. Although the escrow agreement prohibits the LNC from requesting any money in excess of the contribution limit, it does allow the committee to accept the "entire balance of the Escrow Fund" if it successfully "challenge[s] the legal validity of the [c]ontribution [l]imit in federal court." Escrow Agreement ¶ 3.
The LNC now seeks to do just that. On January 25, 2016, it filed this action challenging both the application of FECA's contribution limits to Shaber's bequest and FECA's new two-tiered limit on contributions to general and segregated accounts. See Complaint ¶¶ 21-34, Libertarian National Committee , 317 F. Supp. 3d 202 (No. 16-cv-00121), ECF No. 1. Proceeding under FECA's special judicial review provision, the district court then certified factual findings and "non-frivolous constitutional questions" to this en banc court. Holmes v. Federal Election Commission , 875 F.3d 1153, 1157 (D.C. Cir. 2017) (en banc); see also 52 U.S.C. § 30110 ("The district court immediately shall certify all questions of constitutionality of [FECA] to the United States court of appeals for the circuit involved, which shall hear the matter sitting en banc.").
With the benefit of the district court's findings of fact and certification order, we now consider the three legal questions articulated by the district court. See Order, Libertarian National Committee , 317 F. Supp. 3d 202 (No. 16-cv-00121), ECF No. 34 ("Certification Order"). First:
Does imposing annual contribution limits against the bequest of Joseph Shaber violate the First Amendment rights of the Libertarian National Committee?
Id. at 2. Second:
Do [FECA's contribution limits], on their face, violate the First Amendment rights of the Libertarian National Committee by restricting the purposes for which the Committee may spend its contributions above [the] general purpose contribution limit to those specialized purposes enumerated in § 30116(a)(9) ?
Id. Or, put more simply, does FECA's two-tiered contribution limit, on its face, violate the First Amendment? And third:
Do [FECA's contribution limits] violate the First Amendment rights of the Libertarian National Committee by restricting the purposes for which the Committee may spend that portion of the bequest of Joseph Shaber that exceeds [the] general purpose contribution limit to those specialized purposes enumerated in § 30116(a)(9) ?
Id. Again, put more simply, does FECA's two-tiered contribution limit, as applied to Shaber's bequest, violate the First Amendment?
After assuring ourselves of subject-matter jurisdiction, we address each question in turn.
II.
"[T]he 'irreducible constitutional minimum' of standing consists of three elements.
*538 The plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." Spokeo, Inc. v. Robins , --- U.S. ----, 136 S. Ct. 1540, 1547, 194 L.Ed.2d 635 (2016) (internal citation omitted) (quoting Lujan v. Defenders of Wildlife , 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) ). The Commission sees three defects in the LNC's standing. We see none.
The Commission first argues that by electing to place the balance of Shaber's gift into escrow instead of accepting it into segregated accounts, the LNC has inflicted its own injury. See National Family Planning & Reproductive Health Ass'n v. Gonzales , 468 F.3d 826, 831 (D.C. Cir. 2006) (explaining that self-inflicted harm "does not amount to an 'injury' cognizable under Article III," nor is it "fairly traceable to the defendant's challenged conduct"). Of course the Commission is correct in the most literal sense: the LNC did, indeed, put pen to paper and sign the escrow agreement. But as the district court explained in rejecting the Commission's self-infliction argument, the LNC's injury stems not from its inability to accept the entire bequest immediately (which it could have done), but rather from the committee's "inability to accept [immediately] the entire bequest for general expressive purposes " (which FECA prohibits). Libertarian National Committee, Inc. v. Federal Election Commission , 228 F. Supp. 3d 19, 25 (D.D.C. 2017). The Commission forced the LNC to choose between immediate access to the money and long-term flexibility in spending it; that the committee chose the lesser of two evils hardly transforms FECA's limitation into a self-imposed restriction.
The Commission, however, has a response: because "[m]oney is fungible," a dollar contributed into a segregated account "is an extra dollar from the ... general account that becomes available for [the LNC's] general expressive purposes." Federal Election Commission's Motion to Dismiss for Lack of Subject-Matter Jurisdiction ("Motion") at 14-15. Perhaps so, but the arithmetic just does not work. In 2015, the year the LNC first gained access to Shaber's $ 235,575 bequest, it spent only $ 341 on its 2016 presidential nominating convention and $ 7,261 on legal proceedings. Therefore, even assuming the LNC could have maxed out its headquarters spending at $ 100,200 and accepted an additional $ 33,400 into its general account, some $ 94,373 of Shaber's bequest would have remained unused as of December 31, 2015.
Contrary to the Commission's argument, we have no need to examine the LNC's "2016 budget expectations and expenditures." Motion at 17. True, the LNC must demonstrate standing "as of the time [its] suit commence[d]" in January 2016, Del Monte Fresh Produce Co. v. United States , 570 F.3d 316, 324 (D.C. Cir. 2009), and expense reports reveal that by the end of 2016, the LNC had incurred enough convention, headquarters, and legal costs to have fully absorbed what remained of Shaber's donation-assuming the money it spent on those expenses was itself unrestricted and thus fully fungible. But by January 2016, Shaber's bequest sat locked in an escrow account over which-at the Commission's direction-the LNC exercised "no control." FEC Advisory Opinion 2015-05 (Shaber), 2015 WL 4978865, at *3 (Aug. 11, 2015). The relevant date is therefore September 2015, when the LNC committed itself to the escrow arrangement. At that time, although the committee may have projected certain expenses, it lacked perfect information about what costs it would incur and what other donations it might receive in the new year. We cannot *539 rely on hindsight to fault the LNC for its failure of foresight, and in any event, our task is not to assess the committee's financial planning acumen. Rather, we must determine only whether the LNC suffered a cognizable injury in fact that is fairly traceable to the Commission's conduct (and, by extension, to FECA). The LNC easily clears that bar.
Next, the Commission argues that a favorable judicial determination could not redress the LNC's injury because this suit, filed in 2016, seeks only injunctive and declaratory relief for harm suffered a year earlier in 2015, when Shaber's bequest became available. To be sure, our Article III authority does not include the power to turn back time. Nonetheless, much of the money remains tied up in escrow, and we most certainly do have authority to invalidate the challenged portions of FECA-which, per the escrow agreement, would afford the LNC immediate access to the remainder of the bequest for all purposes. See Escrow Agreement ¶ 3. That is redress.
Finally, the Commission points out that the LNC "lacks standing to the extent its claims" depend on the allegation that the challenged contribution limits "place the Libertarian Party at a competitive disadvantage vis-à-vis other political parties," which, the Commission argues, "is akin to the oft-rejected argument that a party is harmed because it is at a fundraising disadvantage to its competitors." Motion at 20-21. But according to the LNC, "that extent is zero." Plaintiff's Opposition to Defendant's Motion to Dismiss ("Opposition") at 15. Taking the LNC at its word, we conclude, as did the district court, that the committee has alleged a cognizable harm in its inability to accept immediately "the entire bequest for general expressive purposes ." Libertarian National Committee, Inc. , 228 F. Supp. 3d at 25.
III.
We proceed to the first certified question: whether applying FECA's annual contribution limits specifically to Shaber's bequest violates the LNC's First Amendment rights.
A.
As the Supreme Court recognized in Buckley v. Valeo -its first and seminal case examining FECA's constitutionality-contribution limits "operate in an area of the most fundamental First Amendment activities." 424 U.S. 1, 14, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976) (per curiam). "There is no right more basic in our democracy," the Chief Justice explained in his recent plurality opinion in McCutcheon v. Federal Election Commission , "than the right to participate in electing our political leaders." 572 U.S. 185, 191, 134 S.Ct. 1434, 188 L.Ed.2d 468 (2014) (plurality opinion).
In fact, political contributions implicate two distinct First Amendment rights: freedom of speech and freedom of association. "When an individual contributes money to a candidate, he exercises both of those rights: The contribution 'serves as a general expression of support for the candidate and his views' and 'serves to affiliate a person with a candidate.' " McCutcheon , 572 U.S. at 203, 134 S.Ct. 1434 (plurality opinion) (quoting Buckley , 424 U.S. at 21-22, 96 S.Ct. 612 ). The recipient, too, has First Amendment interests in accepting campaign contributions. "[V]irtually every means of communicating ideas in today's mass society requires the expenditure of money," from "distributi[ng] ... the humblest handbill," to "hiring a hall and publicizing" rallies, to purchasing airtime on "television, radio, and other mass media." Buckley , 424 U.S. at 19, 96 S.Ct. 612. And, of course, just as *540 contributors associate with candidates and parties by making donations, so, too, do recipients associate with contributors by accepting donations. See id. at 18, 22, 96 S.Ct. 612 (explaining that contributions "enable[ ] like-minded persons to pool their resources in furtherance of common political goals" and that contribution limits therefore restrict "association by persons, groups, candidates, and political parties").
Altogether, then, in the world of political contributions, the First Amendment protects two kinds of rights (speech and association) belonging to two different rights-holders (donors and recipients). As the parties argue this case, however, the First Amendment interests at issue occupy only one box of the rights/rights-holders two-by-two matrix. Because "Shaber's death ended his expression and association," and because the LNC "does not associate with the dead," the committee admits that "[t]his case concerns primarily the LNC's speech rights with respect to the Shaber bequest." Appellant's Br. 34-35. We thus find ourselves in the speech-recipient box.
According to the Commission, contribution limits have only minimal bearing on a recipient's free-speech rights. On the one hand, as the Commission observes, the Court held in Buckley that "restriction[s] on the amount of money a ... group can spend on political communication during a campaign"-that is, expenditure limits-"necessarily reduce[ ] the quantity of expression" and therefore receive "the exacting scrutiny applicable to limitations on core First Amendment rights." Buckley , 424 U.S. at 19, 44-45, 96 S.Ct. 612 (emphasis added). On the other hand, restrictions on the amount of money someone can donate -that is, contribution limits-"merely ... require candidates and political committees to raise funds from a greater number of persons" "rather than ... reduce the total amount of money potentially available to promote political expression." Id. at 22, 96 S.Ct. 612. Therefore, as the Court explained in Buckley and reiterated in McConnell v. Federal Election Commission , "[b]ecause the communicative value of large contributions inheres mainly in their ability to facilitate the speech of their recipients, ... contribution limits impose serious burdens on free speech only if they are so low as to 'preven[t] candidates and political committees from amassing the resources necessary for effective advocacy.' " McConnell v. Federal Election Commission , 540 U.S. 93, 135, 124 S.Ct. 619, 157 L.Ed.2d 491 (2003) (third alteration in original) (quoting Buckley , 424 U.S. at 21, 96 S.Ct. 612 ); see also Randall v. Sorrell , 548 U.S. 230, 248, 126 S.Ct. 2479, 165 L.Ed.2d 482 (2006) (plurality opinion) (explaining that contribution limits fail "to survive First Amendment scrutiny" if they "prevent candidates from 'amassing the resources necessary for effective [campaign] advocacy' " or "magnify the advantages of incumbency to the point where they put challengers to a significant disadvantage" (alteration in original) (quoting Buckley , 424 U.S. at 21, 96 S.Ct. 612 )).
If that is the test, then FECA's contribution limit as applied to Shaber's bequest clearly passes. The LNC nowhere claims that it needs Shaber's money in order to "amass[ ] the resources necessary for effective advocacy." Buckley , 424 U.S. at 21, 96 S.Ct. 612. Surely, Shaber's gift hardly represents a make-or-break sum for the committee's ability to engage in political communication. We doubt, moreover, that the LNC could make such a showing given that FECA's current contribution limits are no lower than the ceilings the Court approved in McConnell .
With respect to donors' rights, by contrast, contribution limits tread closer to core First Amendment activity. To be sure, the speech embodied by a political *541 contribution lacks nuance: because a contribution "does not communicate the underlying basis for the [donor's] support," "[a]t most, the size of the contribution provides a very rough index of the intensity of the contributor's support for the candidate." Buckley , 424 U.S. at 21, 96 S.Ct. 612. That said, the ability to express support through monetary donations provides an "important means of associating with a candidate or committee," id. at 22, 96 S.Ct. 612 -and a particularly important means, at that, for "individuals who do not have ready access to alternative avenues for supporting their preferred politicians," such as volunteering in person, McCutcheon , 572 U.S. at 205, 134 S.Ct. 1434 (plurality opinion). To protect contributors' heterogeneous First Amendment interests in making political donations, therefore, the Court has announced a single unified test that applies an intermediate level of scrutiny to contribution limits. See Nixon v. Shrink Missouri Government PAC , 528 U.S. 377, 388, 120 S.Ct. 897, 145 L.Ed.2d 886 (2000) (explaining that "a contribution limitation surviving a claim of associational abridgment would survive a speech challenge as well"). "Closely drawn" scrutiny, as the Court now calls it, requires that "the [government] demonstrate[ ] a sufficiently important interest and employ[ ] means closely drawn to avoid unnecessary abridgment" of First Amendment rights. Buckley , 424 U.S. at 25, 96 S.Ct. 612 ; see also McCutcheon , 572 U.S. at 197, 134 S.Ct. 1434 (plurality opinion) (same).
But these decisions have left open the question whether closely drawn scrutiny-usually justified as a mechanism to safeguard donors' rights-also applies to a law limiting a recipient's right to receive a donation absent a corollary restriction on a contributor's right to contribute. Because the typical donor is a living human being capable of both speaking and associating, neither the Supreme Court nor we have had occasion to untangle a recipient's rights from its donors'. But even though Shaber no longer speaks nor associates, Buckley and its progeny hardly foreclose application of closely drawn scrutiny to the contribution limit at issue in this case. We shall therefore assume, without deciding, that closely drawn scrutiny applies to the imposition of contribution limits on Shaber's bequest. And because we conclude that FECA's limits survive even that heightened standard of review, we have no need to interrogate that assumption further.
B.
"In a series of cases over the past 40 years," the Supreme Court has repeatedly recognized the government's interest in imposing contribution limits to combat " 'quid pro quo' corruption [and] its appearance." McCutcheon , 572 U.S. at 192, 134 S.Ct. 1434 (plurality opinion) (emphasis omitted). The risk that candidates might exchange political favors for money is far from hypothetical. As the Court explained in McConnell , "[t]he idea that large contributions to a national party can corrupt or, at the very least, create the appearance of corruption of federal candidates and officeholders is neither novel nor implausible." 540 U.S. at 144, 124 S.Ct. 619. Indeed, both Buckley and McConnell cited "deeply disturbing examples" of "pernicious practices" in then-recent election cycles. Buckley , 424 U.S. at 27, 96 S.Ct. 612 ; see also McConnell , 540 U.S. at 122, 124 S.Ct. 619 (noting "disturbing findings of a Senate investigation into campaign practices related to the 1996 federal elections"). Therefore, given the threat posed by actual and apparent corruption to "the integrity of our system of representative democracy," Buckley , 424 U.S. at 26-27, 96 S.Ct. 612, the Court has long held that "the Government's interest in preventing *542 quid pro quo corruption or its appearance ... may properly be labeled 'compelling,' " McCutcheon , 572 U.S. at 199, 134 S.Ct. 1434 (plurality opinion) (emphasis omitted) (quoting Federal Election Commission v. National Conservative Political Action Committee , 470 U.S. 480, 496, 105 S.Ct. 1459, 84 L.Ed.2d 455 (1985) ).
The risk of quid pro quo corruption does not disappear merely because the transfer of money occurs after a donor's death. Individuals planning to bequeath a large sum to a political party have two points of leverage during their lifetimes: they may tell the party about their intentions, and they may change their minds at any time. That latter possibility, as the district court found, "creates an incentive for a national party committee to limit the risk that a planned bequest will be revoked" and could cause that party, "its candidates, or its office holders to grant political favors to the individual in the hopes of preventing the individual from revoking his or her promise." CF ¶ 100 (first quoting Findings of Fact ¶ 92, Libertarian National Committee, Inc. v. Federal Election Commission (LNC I ), 930 F. Supp. 2d 154, 186 (D.D.C. 2013), aff'd , No. 13-5094, 2014 WL 590973 (D.C. Cir. Feb. 7, 2014); then quoting Defendant Federal Election Commission's Proposed Findings of Facts ¶ 80, Libertarian National Committee , 317 F. Supp. 3d 202 (No. 16-cv-00121), ECF No. 26-3 ) (internal quotation marks omitted). In other words, a donor's death simply imposes a sequencing constraint on a quid pro quo exchange. Instead of money for votes, the donor requires votes for money-or, to be more precise, political favors now for the promise of money later . And even that constraint evaporates in the case of corrupt donors seeking favors for their survivors. Although an individual's death terminates his ability to profit personally from a corrupt quo in exchange for his bequeathed quid, the donor's surviving friends and family remain all too capable of accepting political favors that their deceased benefactor may have pre-arranged for their benefit.
What's more, where the courts have observed a risk of corruption, so too will the electorate. As the Court explained in Buckley , "[o]f almost equal concern as the danger of actual quid pro quo arrangements is the impact of the appearance of corruption stemming from public awareness of the opportunities for abuse inherent in a regime of large individual financial contributions." 424 U.S. at 27, 96 S.Ct. 612. Voters lack the means to examine the intentions behind suspiciously sizable contributions, a problem that becomes especially acute in the case of a deceased donor who, of course, is forever unavailable to answer inquiries. As a result, the corruptive potential of unregulated contributions, including the unregulated contributions of the dead, inflicts almost as much harm on public faith in electoral integrity as corruption itself.
The LNC acknowledges these risks. "Nobody here disputes the theoretical corruption potential of bequests," declares the committee. Reply Br. 13. And as a result, the LNC has declined, both before the district court and on appeal, to "revisit" the conclusion that bequests "generally warrant[ ] ... subjection to FECA's contribution limits." Appellant's Br. 35; see also CF ¶ 93 (" '[I]t is possible for a bequest to raise valid anti-corruption concerns,' as the LNC has 'concede[d].' " (alterations in original) (quoting LNC I , 930 F. Supp. 2d at 166 )).
It is precisely because the LNC concedes "the theoretical corruption potential of bequests," Reply Br. 13, that we do not share our dissenting colleague's concern that "the [Commission] points to nothing substantiating" the same, Op. at 563 (Katsas, *543 J.). The government may, just like any other litigant in any other case, accept an opposing party's concession. Moreover, among the district court's findings that the LNC declines to dispute, see Oral Arg. Rec. 32:01-18 (conceding that this court is bound by the district court's findings of fact unless clearly erroneous), are several that amount to substantial evidence demonstrating the government's anticorruption interest in regulating bequests. To begin with, contrary to the dissent's assertion that "bequests are rarely used for political contributions," Op. at 563 (Katsas, J.), the district court found that since 1978 donors have contributed "more than $ 3.7 million in bequeathed funds," not infrequently in five- and six-figure amounts. CF ¶ 102; see also CF ¶¶ 103-08 (listing bequeathed contributions to national political party committees). And that figure is "likely underreported," as "reporting entities are not required to inform the [Commission] that a particular contribution they received came from a bequest." CF ¶ 102. In fact, the LNC did not report Shaber's bequest as such. See CF ¶ 102. Furthermore, the district court found that "nothing prevents a living person from informing the beneficiary of a planned bequest about that bequest," CF ¶ 94; that "[p]olitical committees 'could feel pressure to ... ensure that a (potential) donor is happy with the committee's actions lest [that donor] revoke the bequest,' " CF ¶ 100 (second and third alterations in original) (quoting LNC I , 930 F. Supp. 2d at 167 ); and that this pressure could cause a "national party committee, its candidates, or officeholders ... [to] grant that individual political favors," CF ¶ 99 (internal quotation marks omitted). Altogether, the district court's 178 paragraphs of findings amount to much more than " 'mere conjecture,' " Op. at 563 (Katsas, J.) (quoting McCutcheon , 572 U.S. at 210, 134 S.Ct. 1434 (plurality opinion)), that bequests pose a threat of quid pro quo corruption.
Disclaiming any "categorical challenge to the limitation of all bequests," the LNC instead asks us to conduct an "as-applied" inquiry "narrowly focused on one particular bequest": "whether Shaber's bequest, specifically, warrants government limitation." Appellant's Br. 30, 35. It does not, says the LNC, because the bequest was not corrupt and the government therefore has no legitimate interest in its restriction.
As to the first half of the LNC's argument, we have no trouble making the unremarkable assumption that Shaber's contribution was not, in fact, part of a corrupt quid pro quo exchange. Buckley rested on precisely the same assumption-that "most large contributors do not seek improper influence over a candidate's position or an officeholder's action." Buckley , 424 U.S. at 29, 96 S.Ct. 612. Indeed, the LNC's observation that contribution limits restrict legitimate as well as corrupt donations is wholly unsurprising. The Court has often "noted that restrictions on direct contributions are preventative, because few if any contributions to candidates will involve quid pro quo arrangements." Citizens United v. Federal Election Commission , 558 U.S. 310, 357, 130 S.Ct. 876, 175 L.Ed.2d 753 (2010) (emphasis omitted).
But that is precisely the point: it is "difficult to isolate suspect contributions" in the sea of legitimate donations. Buckley , 424 U.S. at 30, 96 S.Ct. 612. As the LNC sees it, because the government's interest lies in preventing quid pro quo corruption, the government may restrict only corrupt contributions. The government, however, already has those restrictions on the books: they are called bribery laws. But bribery laws "deal with only the most blatant and specific attempts of those with money to influence governmental action," id. at 28, 96 S.Ct. 612, and if those laws *544 were sufficient to achieve the government's compelling interest in preventing quid pro quo corruption and its appearance, then Congress would have had no need in the first place to impose contribution limits to combat prior decades' "deeply disturbing" quid pro quo arrangements, id. at 27, 96 S.Ct. 612. Accordingly, the problem with the LNC's proposed regime-one under which actually noncorrupt contributions could exceed FECA's limits-is that corruption is notoriously difficult to ferret out, and "the scope of ... pernicious practices can never be reliably ascertained." Id. Because "the First Amendment does not require Congress to ignore the fact that 'candidates, donors, and parties test the limits of the current law,' " McConnell , 540 U.S. at 144, 124 S.Ct. 619 (quoting Federal Election Commission v. Colorado Republican Federal Campaign Committee , 533 U.S. 431, 457, 121 S.Ct. 2351, 150 L.Ed.2d 461 (2001) ), "prophylactic" contribution limits, McCutcheon , 572 U.S. at 221, 134 S.Ct. 1434 (plurality opinion), are permissible-even vital-to forestall the worst forms of political corruption.
Critically, moreover, even if through some omniscient power courts could separate the innocent contributions from the nefarious, an appearance of corruption would remain. Although "Congress may not regulate contributions simply to reduce the amount of money in politics," id. at 191, 134 S.Ct. 1434 (plurality opinion), it may certainly do more than ask the public to place groundless faith in a bribery-prevention scheme that has failed to thwart corruption in the past. "It is therefore reasonable," the Court explained in McConnell , "to require that all parties and all candidates follow the same set of rules" in order to prevent " 'both the actual corruption threatened by large financial contributions and the eroding of public confidence in the electoral process through the appearance of corruption.' " 540 U.S. at 136, 159, 124 S.Ct. 619 (quoting Federal Election Commission v. National Right to Work Committee , 459 U.S. 197, 208, 103 S.Ct. 552, 74 L.Ed.2d 364 (1982) ).
That is not to say as-applied challenges to FECA's contribution limits are impossible. Because restrictions that strike a permissible balance between governmental and individual interests may nonetheless "impose heavy burdens on First Amendment rights in individual cases," John Doe No. 1 v. Reed , 561 U.S. 186, 203, 130 S.Ct. 2811, 177 L.Ed.2d 493 (2010) (Alito, J., concurring), people may bring as-applied challenges to demonstrate that, in their unique circumstances, the law in question works too harshly. For example, "a nascent or struggling minor party can bring an as-applied challenge" to a contribution limit that "prevents [the party] from 'amassing the resources necessary for effective advocacy,' " McConnell , 540 U.S. at 159, 124 S.Ct. 619 (quoting Buckley , 424 U.S. at 21, 96 S.Ct. 612 ), and, similarly, a group may bring an as-applied challenge to a campaign-contribution disclosure provision that subjects its donors to " 'threats, harassment, or reprisals,' " Citizens United , 558 U.S. at 367, 130 S.Ct. 876 (quoting McConnell , 540 U.S. at 198, 124 S.Ct. 619 ); see also Doe, 1 v. Federal Election Commission , 920 F.3d 866, 871 (D.C. Cir. 2019) (" Citizens United left open the possibility of an as-applied First Amendment challenge, but only if the donor proved that revealing its identity would probably bring about threats or reprisals."). But while an individual may demonstrate that, in his particular case, a contribution limit imposes an impermissibly high burden, donors and recipients may not use the guise of an as-applied challenge merely to relitigate the government's settled interest in enforcing "preventative" limits, Citizens United , 558 U.S. at 357, 130 S.Ct. 876, *545 against all contributions-corrupt and noncorrupt alike. "[A] plaintiff cannot successfully bring an as-applied challenge to a statutory provision based on the same factual and legal arguments the Supreme Court expressly considered when rejecting a facial challenge to that provision." Republican National Committee v. Federal Election Commission , 698 F. Supp. 2d 150, 157 (D.D.C.) (three-judge panel), aff'd , 561 U.S. 1040, 130 S.Ct. 3544, 177 L.Ed.2d 1119 (2010).
Unlike the LNC and the dissent, see Op. at 567 (Katsas, J.), we see nothing to the contrary in SpeechNow.org v. Federal Election Commission , 599 F.3d 686 (D.C. Cir. 2010) (en banc). In that case, we sustained an as-applied challenge to a contribution limit on the grounds that "the government ha[d] no anti-corruption interest in limiting contributions to an independent expenditure group," id. at 695, but we did not do so because of anything special about the government's anticorruption interest "in that case" in particular, Op. at 567 (Katsas, J.). Instead, we explained that because the Supreme Court had recently held in Citizens United "as a matter of law that independent expenditures do not corrupt or create the appearance of quid pro quo corruption," neither could contributions to independent expenditure-only groups "corrupt or create the appearance of corruption." SpeechNow.org , 599 F.3d at 694 (emphasis omitted). In this case, by contrast, the LNC raises no challenge to Buckley nor to the anticorruption interest that case and its successors recognized. See Appellant's Br. 60 n.13 ("[T]his case does not challenge Buckley .").
The dissent suggests that even if the government has an interest in limiting bequests disclosed during donors' lifetimes, it lacks a similar interest in regulating the class of bequests kept secret until donors' deaths. See Op. at 564-65 (Katsas, J.). The trouble, however, is that because the LNC states in no uncertain terms that its "as-applied Shaber challenge ... does not contest any contribution limit's general sweep," Reply Br. 11, we are limited to addressing only the matters raised and litigated by the parties and certified to this court for review, see 52 U.S.C. § 30110 -that is, whether "imposing annual contribution limits against the bequest of Joseph Shaber" violates the LNC's First Amendment rights. Certification Order 2. Indeed, the LNC expressly foreswears any broader challenge. See supra at 543. Perhaps, as the dissent proposes, the Commission might be able to "police" bequest disclosures in the same manner it distinguishes coordinated from independent expenditures. Op. at 565 (Katsas, J.). But there are significant differences, both practical and constitutional, between independent expenditures, coordinated expenditures, and contributions. See supra at 540-41; see also McConnell , 540 U.S. at 221, 124 S.Ct. 619 (explaining that coordinated expenditures "may be regulated as indirect contributions"). For now, then, we simply observe that the task of distinguishing truly uncoordinated from covertly disclosed bequests would seem to require the same sorts of fact-intensive inquiries and give rise to the same sorts of appearance-of-corruption concerns that prophylactic contribution limits are designed to avoid. Without the parties to guide us, we decline to venture into such challenging terrain. See Carducci v. Regan , 714 F.2d 171, 177 (D.C. Cir. 1983) ("The premise of our adversarial system is that appellate courts do not sit as self-directed boards of legal inquiry and research, but essentially as arbiters of legal questions presented and argued by the parties before them.").
We thus return to the LNC's bottom line: "[W]hat about Shaber ?" Reply Br. 14. By the LNC's logic, the only individuals *546 who must keep their contributions under FECA's limits are those who intend to violate the bribery laws. That just cannot be what the First Amendment requires. We therefore answer the first certified question in the negative: imposing FECA's contribution limits on Shaber's bequest does not violate the LNC's First Amendment rights.
IV.
This brings us to the second and third certified questions-a facial and an as-applied challenge-which ask whether it offends the First Amendment that donors may contribute above the base limit only if they make their contributions into segregated, dedicated-purpose accounts.
A.
The only portion of FECA at issue here is an amendment contained in the Consolidated and Further Continuing Appropriations Act-what we reluctantly assent to calling the "cromnibus" amendment. The LNC assures us, as it must, that it "would not have brought, and the District Court would not have certified, a challenge to the sort of contribution limits that the Supreme Court upheld in McConnell ." Appellant's Br. 40. Instead, the LNC contends that because the 2014 cromnibus amendment "radically altered FECA's nature and structure," id. , we must now apply a heightened level of scrutiny. What was constitutional before, the theory goes, is constitutional no longer.
Accordingly, we begin by considering precisely what "sort of contribution limits ... the Supreme Court upheld in McConnell ." Id. A little history will help.
In the FECA Amendments of 1976, Congress imposed a $ 20,000 limit on "contributions" to national party committees. Federal Election Campaign Act Amendments of 1976, Pub. L. No. 94-283, § 112(2), 90 Stat. 475, 487 (codified as amended at 52 U.S.C. § 30116(a)(1)(B) ). But not all donations qualified as contributions. Instead, FECA defined "contribution" as a gift "made ... for the purpose of influencing any election for Federal office," thus leaving unregulated any money ostensibly donated for the purpose of influencing state and local elections. Federal Election Campaign Act Amendments of 1979, Pub. L. No. 96-187, § 101, 93 Stat. 1339, 1340 (1980) (codified as amended at 52 U.S.C. § 30101(8) ). And so "soft money" was born. While FECA subjected contributions for the purpose of influencing federal elections (so-called hard money) to its limits, parties remained free to "raise [soft money] in massive dollops from single contributors." Shays v. Federal Election Commission , 414 F.3d 76, 81 (D.C. Cir. 2005). "Over time, political parties took increasing advantage of ... soft money opportunities," id. , causing, as the Senate Committee on Governmental Affairs described it, "a 'meltdown' of the campaign finance system," McConnell , 540 U.S. at 129, 124 S.Ct. 619 (quoting S. Rep. No. 105-167, vol. 4, at 4611 (1998); id. , vol. 5, at 7515).
Seeking to close the "soft-money loophole," McConnell , 540 U.S. at 133, 124 S.Ct. 619, Congress enacted the Bipartisan Campaign Reform Act in 2002. See Bipartisan Campaign Reform Act of 2002, Pub. L. No. 107-155, 116 Stat. 81. Through that statute, known as BCRA, Congress took a two-pronged approach to purging federal elections of soft money: it prohibited national political party committees from accepting or "spend[ing] any funds" "not subject to" FECA, and it prohibited (with limited exceptions) state, district, and local party committees from "expend[ing] or disburs[ing] for Federal election activity" any funds raised outside FECA's limits. Id. § 101 (codified at 52 U.S.C. § 30125(a), (b) ). Approving these soft-money restrictions *547 in McConnell , the Supreme Court rejected the argument that BCRA imposes an impermissible expenditure limit rather than a permissible contribution limit. According to the Court, BCRA's soft-money ban, though styled as a restriction on party "spending," "simply limit[s] the source and individual amount of donations" without "limit[ing] the total amount of money parties can spend." McConnell , 540 U.S. at 139, 124 S.Ct. 619. "[I]t is irrelevant," the Court explained, "that Congress chose ... to regulate contributions on the demand rather than the supply side." Id. at 138, 124 S.Ct. 619.
So what changed? The 2014 cromnibus amendment introduced gradations into the political party contribution limit where none had been before. As previously explained, see supra at 536-37, FECA now permits donors to contribute up to three times the inflation-adjusted base limit into any of three new "separate, segregated account[s] ... used ... to defray expenses incurred with respect to" presidential nominating conventions, headquarters buildings, and recounts and other legal proceedings. 52 U.S.C. § 30116(a)(9).
Insisting that this case differs meaningfully from Buckley and McConnell , the LNC argues that we must apply strict scrutiny to FECA's new two-tiered scheme. We disagree.
The LNC first contends that because the statute now restricts how certain funds may be "used," 52 U.S.C. § 30116(a)(9), the cromnibus amendment "transformed" FECA's contribution limit into an expenditure limit, Appellant's Br. 41. But McConnell forecloses this argument. That decision teaches that the difference between an expenditure limit and a contribution limit hinges not on the statute's use of magic words such as "spend" (as in BCRA) or "use" (as in the cromnibus amendment), but rather on a functional test. "The relevant inquiry is whether the mechanism adopted to implement the contribution limit, or to prevent circumvention of that limit, burdens speech in a way that a direct restriction on the contribution itself would not." McConnell , 540 U.S. at 138-39, 124 S.Ct. 619.
That test makes this an easy case. Neither the general-purpose contribution ceiling nor the 300%-higher dedicated-purpose contribution ceiling "in any way limits the total amount of money parties can spend." Id. at 139, 124 S.Ct. 619. The cromnibus amendment says nothing about how much money political party committees may expend on general purposes, conventions, headquarters, and recounts. Instead, the two-tiered scheme does nothing more than its single-tiered predecessor: it "simply limit[s] the source and individual amount of donations" for each category of expenses. Id. Or, as the Court put it in Buckley , "[t]he overall effect of the Act's contribution ceilings is merely to require ... political committees to raise funds from a greater number of persons ... rather than to reduce the total amount of money potentially available to promote political expression." 424 U.S. at 21-22, 96 S.Ct. 612. That is a contribution limit through and through.
The LNC's second tack is somewhat more creative, albeit no more successful. Consider, the LNC posits, a contribution from Donor Doe that exceeds the base limit by $ 1, i.e., a $ 33,401 donation. Under the cromnibus amendment's two-tiered contribution limit, the committee may use Doe's extra dollar to pay for a presidential nominating convention but not a midterm convention, or for a sign on its headquarters but not a billboard on the street. According to the LNC, then, regardless of whether the two-tiered limit imposes a permissible contribution ceiling on donors, with respect to recipients, FECA's "spending *548 purpose restrictions directly limit how the LNC may express itself" based on the content of its speech. Appellant's Br. 46; see also Reply Br. 20 (criticizing the Commission's "obsessive focus on contributors' interests" as "irrelevant, because the restrictions at issue target the parties' accounts" and because "[i]t is not the donors who are barred from spending beyond the accounts' segregated purposes"). For this proposition, the LNC relies on Reed v. Town of Gilbert , in which the Court recently held that laws "defining regulated speech by particular subject matter, ... function[,] or purpose," "are subject to strict scrutiny." --- U.S. ----, 135 S. Ct. 2218, 2227, 192 L.Ed.2d 236 (2015) ; see also Appellant's Br. 47-48 (arguing that "[c]haracterizing FECA's revised contribution limit as a pure contribution limit does not alter the fact that it 'target[s] speech based on its communicative content,' 'by particular subject matter, and ... by its function or purpose' " (second and third alterations in original) (citation omitted) (quoting Reed , 135 S. Ct. at 2226-27 )).
But the LNC misses one crucial element in the "content-based restriction on speech" inquiry: speech. Recall that Buckley drew a clear distinction between spending money (expenditures) and receiving money (contributions). Restrictions on the former regulate speech, as "virtually all meaningful political communications in the modern setting involve the expenditure of money" so that an absolute limit on a political party's expenditures necessarily restricts its total amount of expression. Buckley , 424 U.S. at 11, 96 S.Ct. 612. Restrictions on the latter, however, are something different. Receiving money facilitates speech, to be sure, but a bank account balance becomes speech only when spent for expressive purposes. This is why the Court has made clear "that contribution limits impose serious burdens on free speech only if they are so low as to 'preven[t] ... political committees from amassing the resources necessary for effective advocacy.' " McConnell , 540 U.S. at 135, 124 S.Ct. 619 (quoting Buckley , 424 U.S. at 21, 96 S.Ct. 612 ).
So there lies the solution to the Donor Doe problem. The LNC's speech occurs when it spends Doe's money on political expression. That speech remains unencumbered by FECA because, as discussed above, see supra at 547, the cromnibus amendment's two-tiered contribution limit imposes no expenditure limit. True, the LNC may not spend Doe's additional dollar on a billboard. But it may spend as many dollars from as many non-Does as it wants on billboards, so long as it spends no more than $ 33,400 from any single donor. The LNC's speech is thus subject to no restriction, content-based or otherwise.
We emphasize that this case implicates only the sort of line-drawing exercises that inhere in a system of federal campaign finance regulation-that is, lines that define in evenhanded terms covered recipients, donors, and contributions. This case, in other words, presents no plausible claim that FECA's two-tiered contribution limit restricts contributions based on the donor's identity or viewpoint.
And yet, the LNC argues that FECA's two-tiered contribution limit merits strict scrutiny. Consequently, by the LNC's logic, FECA would be rife with content-based restrictions on recipients' speech. For example, the McConnell -approved BCRA prohibits national party committees from "spend[ing] any funds," 52 U.S.C. § 30125(a)(1), donated in excess of FECA's limits, which, in turn, apply to contributions made "for the purpose of influencing any election for Federal office," id. § 30101(8)(A)(i). Likewise, BCRA's soft-money ban prohibits state party committees from spending non-FECA contributions *549 on "Federal election activity." Id. § 30125(b). If, as the LNC argues, a limit on contributions made to segregated accounts dedicated to particular "uses" counts as a content-based restriction on speech, then so, too, would restrictions on spending donations "made ... for the purpose of influencing any election for Federal office" or on expending funds for "Federal election activity." But that, of course, is not the case: as the Court explained in McConnell , BCRA does not "burden[ ] speech in a way that a direct restriction on the contribution itself would not." 540 U.S. at 139, 124 S.Ct. 619.
Consequently, the LNC essentially asks us to conclude that Reed 's application of strict scrutiny to laws that "defin[e] regulated speech by particular subject matter, ... function[,] or purpose," 135 S. Ct. at 2227, overruled, by implication alone, McConnell 's application of closely drawn scrutiny to FECA's contribution limits. To put it mildly, we have our doubts. But if the Supreme Court had intended to shake the constitutional foundation of FECA's contribution-limit architecture, then it is the Supreme Court's province to say so. See Rodriguez de Quijas v. Shearson/American Express, Inc. , 490 U.S. 477, 484, 109 S.Ct. 1917, 104 L.Ed.2d 526 (1989) ("If a precedent of [the Supreme] Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls, leaving to [the Supreme] Court the prerogative of overruling its own decisions."). Unless and until the Court expressly abrogates McConnell , this "inferior court" lacks authority to "conclude [that the Supreme Court's] more recent case[ ]" has, "by implication, overruled an earlier precedent." Agostini v. Felton , 521 U.S. 203, 237, 117 S.Ct. 1997, 138 L.Ed.2d 391 (1997).
B.
With no reason to apply strict scrutiny to the cromnibus amendment's two-tiered contribution limit, we again assume that closely drawn scrutiny supplies the appropriate test. We say "assume" because it remains unclear whether closely drawn scrutiny applies to a recipient's First Amendment interests alone, see supra at 541, and the LNC declines to invoke the rights of its donors, see supra at 540, 547-48. Nevertheless, because we conclude that the cromnibus amendment's two-tiered contribution limit survives closely drawn scrutiny, we have no need to determine whether a less stringent standard of review may apply.
In applying closely drawn scrutiny, "we must assess the fit between the stated governmental objective and the means selected to achieve that objective." McCutcheon , 572 U.S. at 199, 134 S.Ct. 1434 (plurality opinion). "[I]f a law that restricts political speech does not 'avoid unnecessary abridgement' of First Amendment rights, it cannot survive 'rigorous' " closely drawn review. Id. (internal citation omitted) (quoting Buckley , 424 U.S. at 25, 29, 96 S.Ct. 612 ).
The LNC makes no attempt to challenge the government's significant anticorruption interest served by limiting the size of contributions to political parties. Indeed, the LNC invokes the district court's factual finding on this point: "[T]he essential truth," says the committee, "is that '[a]ll contributions to political parties can create the risk of corruption or its appearance regardless of the way that money is ultimately spent ....' " Appellant's Br. 57 (alterations in original) (quoting CF ¶ 36). Rather than contesting the need for contribution limits, the LNC makes a more refined point. "It is one thing to generalize that larger contributions pose a greater *550 risk, and for that reason, impose a simple contribution limit," argues the committee, but "[r]estricting how a party spends 90% of a contribution, in 30% tranches tied to presidential nominating conventions, buildings, and litigation, cannot be explained on a corruption-fighting rationale." Id. at 56. In other words, conceding the need for an overall contribution limit, and taking no issue with drawing that line at either $ 33,400 or $ 334,000, the LNC questions whether the government can demonstrate an anticorruption interest in treating general- and dedicated-purpose contributions differently.
Right out of the gate, the LNC's argument faces a high hurdle: the cromnibus amendment increased the total amount individuals may contribute to a political party. Before 2014, the LNC could accept only a base-limit sized contribution from any one person; now it may accept ten times that amount. Consequently, the LNC's argument sounds very much like a grievance with Congress's decision to raise contribution limits. But so long as contribution limits apply equally to all donors and recipients, "[t]here is ... no constitutional basis for attacking contribution limits on the ground that they are too high." Davis v. Federal Election Commission , 554 U.S. 724, 737, 128 S.Ct. 2759, 171 L.Ed.2d 737 (2008). If, as the LNC concedes, the government had a legitimate anticorruption interest in keeping individual contributions below $ 33,400, then, by simple mathematics, it must also have an interest in keeping contributions below $ 334,000.
We hasten to add a caveat. Although a law does not offend the First Amendment merely because it "conceivably could have restricted even greater amounts of speech in service of [its] stated interests," a law's underinclusivity-in this case, the fact that FECA restricts some contributions less than others-nonetheless "can raise 'doubts about whether the government is in fact pursuing the interest it invokes.' " Williams-Yulee v. Florida Bar , --- U.S. ----, 135 S. Ct. 1656, 1668, 191 L.Ed.2d 570 (2015) (quoting Brown v. Entertainment Merchants Ass'n , 564 U.S. 786, 802, 131 S.Ct. 2729, 180 L.Ed.2d 708 (2011) ). But we see no reason for such skepticism in this case, as allowing donors to make larger contributions into each of the new dedicated-purpose accounts serves Congress's legitimate interest in relaxing restrictions on First Amendment activity where, as it has concluded here, it can achieve its anticorruption interest with less stringent limits.
Take the new, higher limit on contributions to pay for presidential nominating conventions. In April 2014, Congress ended public funding for such conventions, leaving parties on their own. See Gabriella Miller Kids First Research Act, Pub. L. No. 113-94, 128 Stat. 1085 (2014). The cromnibus amendment gives parties a tool for making up for that shortfall, ensuring, as Congress must, that parties remain capable of "amassing the resources necessary for effective advocacy." Buckley , 424 U.S. at 21, 96 S.Ct. 612.
Equally benign are the other two new dedicated-purpose accounts, one for party headquarters and the other for election recounts and "other legal proceedings." 52 U.S.C. § 30116(a)(9). As the Court explained in McConnell , the donations "that pose the greatest risk of ... corruption" are "those contributions ... that can be used to benefit federal candidates directly." 540 U.S. at 167, 124 S.Ct. 619. Congress could have permissibly concluded that unlike contributions that can be used for, say, television ads, billboards, or yard signs, contributions that fund mortgage payments, utility bills, and lawyers' fees have a comparatively minimal impact on a *551 party's ability to persuade voters and win elections. Indeed, congressional leaders supporting the cromnibus amendment emphasized that "many" of the "expenditures made from the [dedicated-purpose] accounts" are "not for the purpose of influencing federal elections." 160 Cong. Rec. S6814 (daily ed. Dec. 13, 2014) (statement of Sen. Reid); id. at H9286 (daily ed. Dec. 11, 2014) (statement of Rep. Boehner). That makes good sense: headquarters, once built, exist regardless of whether an election is afoot, and recounts, by definition, can occur only after votes have been cast. In fact, before BCRA, the Commission entirely excluded donations for both party headquarters and election recounts from the definition of "contribution." See 11 C.F.R. § 100.7(b)(12) (2002) ("A gift ... made to a national committee ... of a political party is not a contribution if it is specifically designated to defray any cost incurred for construction or purchase of any office facility which is not acquired for the purpose of influencing the election of any candidate in any particular election for Federal office."); id. § 100.7(b)(20) ("A gift ... made with respect to a recount of the results of a Federal election, or an election contest concerning a Federal election, is not a contribution ....").
We are untroubled in this case by the fact that, as the LNC observes, the cromnibus amendment passed Congress without the sort of robust record of congressional factfinding that accompanied BCRA. In one sense this might be expected; after all, BCRA imposed new contribution limits, so its additional restriction on First Amendment rights required justification. The cromnibus amendment, by contrast, did just the opposite: it relaxed contribution limits. Had BCRA's extensive legislative history identified some troubling finding related specifically to conventions, headquarters, or legal expenses, we would perhaps harbor more concern about the cromnibus amendment's relatively stingy congressional record. But we have discovered in that record no basis for any such concern, leaving us without any reason to conclude that the Congress of 2014 committed constitutional error by determining that, a dozen years after BCRA, times and circumstances had sufficiently changed to permit it to deal more generously with expense categories less directly tied to particular candidates or elections. See Wagner v. Federal Election Commission , 793 F.3d 1, 30 (D.C. Cir. 2015) (en banc) (noting that contribution restrictions need not address "speculative" concerns).
Our dissenting colleague worries that Congress may have enacted the cromnibus amendment not to better tailor contribution limits to serve the government's anticorruption interest, but rather to benefit the major parties that do the most spending on segregated-account activities. See Op. at 556-57 (Griffith, J.). But the LNC itself, though displeased that FECA's two-tiered contribution limit more closely "align[s] with the financial needs and goals of the incumbent parties," Appellant's Br. 58 (internal quotation marks omitted), expressly disclaims any argument that "the First Amendment requires a level electoral playing field, free of the advantages that speakers may have owing to their resources," Opposition at 26; see also id. at 27 (stating that the LNC's "merits briefing [is] bereft of even a molecule of competitive disadvantage theory" and arguing that "it is absurd for the [Commission] to insist" otherwise). And indeed, the First Amendment requires no such thing. While Congress may not enact contribution limits that "magnify the advantages of incumbency to the point where they put challengers to a significant disadvantage," Randall , 548 U.S. at 248, 126 S.Ct. 2479 (plurality opinion), neither is it "an acceptable governmental objective,"
*552 "[n]o matter how desirable it may seem," "to 'equaliz[e] the financial resources of candidates,' " McCutcheon , 572 U.S. at 207, 134 S.Ct. 1434 (plurality opinion) (second alternation in original) (quoting Arizona Free Enterprise Club's Freedom Club PAC v. Bennett , 564 U.S. 721, 748, 750, 131 S.Ct. 2806, 180 L.Ed.2d 664 (2011) ). Therefore, "if Congress concludes that allowing contributions of a certain amount does not create an undue risk of corruption or the appearance of corruption," the Court has explained, then "a candidate who wishes to restrict an opponent's fundraising cannot argue that the Constitution demands that contributions be regulated more strictly." Davis , 554 U.S. at 737, 128 S.Ct. 2759. By the same token, the mere fact that additional fundraising opportunities will benefit some political parties over others does not itself render Congress's relaxation of contribution limits suspect under the First Amendment. See Federal Election Commission v. Massachusetts Citizens for Life, Inc. , 479 U.S. 238, 257, 107 S.Ct. 616, 93 L.Ed.2d 539 (1986) ("Political 'free trade' does not necessarily require that all who participate in the political marketplace do so with exactly equal resources."). We thus see no reason to " 'doubt[ ] ... [that] the government is in fact pursuing the interest it invokes,' " Williams-Yulee , 135 S. Ct. at 1668 (quoting Brown , 564 U.S. at 802, 131 S.Ct. 2729 ), to justify FECA's two-tiered contribution limit: combatting quid pro quo corruption and its appearance.
At bottom, the cromnibus amendment represents just another tweak in Congress's decades-long project to fine-tune FECA's balance between speech and associational rights, on the one hand, and the government's anticorruption interest, on the other. That balance, to be sure, remains imperfect. But closely drawn scrutiny "require[s] 'a fit that is not necessarily perfect, but reasonable; that represents not necessarily the single best disposition but one whose scope is in proportion to the interest served ....' " McCutcheon , 572 U.S. at 218, 134 S.Ct. 1434 (plurality opinion) (internal quotation marks omitted) (quoting Board of Trustees of the State University of New York v. Fox , 492 U.S. 469, 480, 109 S.Ct. 3028, 106 L.Ed.2d 388 (1989) ). And lacking any " 'scalpel to probe' each possible contribution level," we "defer[ ] to the legislature's" "empirical judgments" about "the precise restriction necessary to carry out the statute's legitimate objectives." Randall , 548 U.S. at 248, 126 S.Ct. 2479 (plurality opinion) (quoting Buckley , 424 U.S. at 30, 96 S.Ct. 612 ).
Here, Congress drew that line at $ 33,400 for general-purpose spending and $ 100,200 for dedicated-purpose spending. The LNC has given us no reason to think that this two-tiered limit would offend the First Amendment. The cromnibus amendment's limits are closely drawn to the government's anticorruption interest, and, as compared to the pre-2014 baseline, they certainly avoid unnecessary infringement of associational and speech rights. We therefore answer the second and third certified questions in the negative: FECA's two-tiered contribution limit, both on its face and as applied to Shaber's bequest, does not violate the LNC's First Amendment rights.
V.
The task of crafting campaign finance restrictions is, in many ways, a zero-sum game. Make the regime too restrictive, and you threaten "fundamental First Amendment interests" by burdening citizens' political expression. Buckley , 424 U.S. at 23, 96 S.Ct. 612. Make the regime too permissive, and you threaten "the integrity of our system of representative democracy" by failing to prevent quid pro quo corruption *553 and its appearance. Id. at 26-27, 96 S.Ct. 612. Balancing these interests has turned out to be a difficult and iterative task. For the reasons given above, we conclude that the current version of FECA-both its application of contribution limits to Shaber's bequest and its use of a two-tiered contribution limit-has achieved a constitutionally permissible balance. Therefore, although we deny the Commission's motion to dismiss for lack of standing, we reject each of the LNC's three constitutional challenges on the merits.
So ordered.